## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>                    Plaintiff,<br><br>          v.<br><br>ONDRICK MATERIALS & RECYCLING, LLC,<br><br>                    Defendant. | Case No.<br><br>**COMPLAINT** |

### INTRODUCTION

1.      Ondrick Materials & Recycling, LLC ("Ondrick" or the "Company") has discharged polluted industrial stormwater from its facility on Industry Road and Fuller Road in Chicopee, Massachusetts (the "Facility") in violation of the federal Clean Water Act, 33 U.S.C. §§ 1251-1387 (the "Clean Water Act" or "the Act"), and the terms of a stormwater permit ("Stormwater Permit") issued by the United States Environmental Protection Agency ("EPA") under the Act. Ondrick performs asphalt paving and roofing manufacturing activities at the Facility.

2.      Ondrick discharges polluted industrial stormwater from its Facility into wetlands connected to the Chicopee River ("Chicopee River Wetlands"), into the Chicopee River, and into a catch basin on Fuller Road that is part of the City of Chicopee's municipal separate storm sewer system.

3.     The Company is not complying with the Act and the Stormwater Permit because it is not properly monitoring and controlling pollutants that flow through all of its discharge locations or "outfalls."

4.     The Commonwealth of Massachusetts ("Commonwealth") therefore brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, reimbursement of its reasonable costs, including attorney fees, and other relief the Court deems appropriate to redress Ondrick's illegal discharges of pollution.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.     On September 28, 2023, the Commonwealth provided notice of Ondrick's violations of the Clean Water Act and of its intention to file suit against Ondrick (the "Notice Letter"), to the Administrator of EPA, the Administrator of EPA Region 1, the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"), and to Ondrick as required by the section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(b)(1)(A).

7.     More than sixty days have passed since notice was served.

8.     This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

9.     The Commonwealth has an interest in protecting for itself and its residents the integrity of Massachusetts waters and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Ondrick's failure to comply with the Clean

Water Act, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Ondrick's activities. Ondrick's continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

10. Venue is proper in the District Court of Massachusetts pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## PARTIES

11. Plaintiff is the Commonwealth, appearing by and through the Attorney General.

12. The Attorney General is the chief law officer of the Commonwealth, with an office at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under Mass. Gen. Laws c. 12, §§ 3 and 11D.

13. Defendant, Ondrick, is a domestic limited liability company with its principal address listed as 22 Industry Road, Chicopee, Massachusetts 01020.

## STATUTORY BACKGROUND

*Federal Clean Water Act Requirements*

14. The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge complies with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

15. Polluted stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking

up pollutants such as sediment, organic matter, nutrients, metals and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people.

16.     To minimize polluted stormwater discharges from industrial facilities, EPA has issued the Stormwater Permit under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued it in 2000, 2008, 2015, and 2021. *See* 60 Fed. Reg. 50,804 (Sept. 29, 1995); 65 Fed. Reg. 64,746 (Oct. 30, 2000); 73 Fed. Reg. 56,572 (Sept. 29, 2008); 80 Fed. Reg. 34,403 (June 4, 2015); 86 Fed. Reg. 10,269 (Feb. 19, 2021). Citations herein are to the 2021 Stormwater Permit, which is the same for all relevant purposes as the 2015 version, except that the 2021 revision does not require scrap recycling facilities to monitor their stormwater for the presence of iron.

17.     The Permit is applicable to all facilities that fall within specified sectors (*see* Stormwater Permit, Appendix D) and that discharge industrial stormwater to waters of the United States directly or through municipal separate storm sewer systems.

18.     Companies that manufacture asphalt paving and roofing materials like the Facility are subject to the requirements of the Permit. Stormwater Permit, Appendix D.

19.     The Stormwater Permit requires a company such as these to, among other things:

   a.   prepare a Stormwater Pollution Prevention Plan ("SWPPP") for the facility that includes, among other things, an adequate site description that includes the locations of all stormwater outfalls, the locations of all stormwater conveyances, a site map with the boundaries of industrial activity at the facility, a description of the nature of the industrial activities at the facility, and the location of potential pollutant sources (Stormwater Permit section 6.2.2);

4

b. submit a "complete and accurate Notice of Intent ("NOI") to EPA for the facility that, among other things, identifies all industrial activities and lists all stormwater outfalls by a unique three-digit code and corresponding latitude and longitude coordinates (Stormwater Permit section 1.3);

c. select, design, install, and implement required pollutant control measures for the company's primary industrial activity and all co-located industrial activities (Stormwater Permit, sections 2.1, 8.D, 8.N.3.1);

d. collect and analyze stormwater samples and document monitoring procedures for monitoring requirements that apply to the company's primary industrial activity and any co-located industrial activities (Stormwater Permit, section 4), including:

   i. benchmark monitoring for:

      1. total suspended solids ("TSS") (Stormwater Permit, section 8.D.4 (asphalt paving and roofing facilities); and;

   ii. indicator monitoring for polycyclic aromatic hydrocarbons ("PAHs") (Stormwater Permit, section 8.D.3 (asphalt paving and roofing materials));

e. report all monitoring data to EPA within mandatory deadlines (Stormwater Permit, section 7);

f. conduct routine facility inspections and quarterly visual assessments to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and

ensure timely corrective actions are taken when they are not (Stormwater Permit, sections 3.1 and 3.2);

g.  conduct and document corrective action and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit (Stormwater Permit, section 5); and

h.  timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions and additional implementation measures (Stormwater Permit, section 7.4).

*Citizen Suit Provision of the Federal Clean Water Act*

20.  Section 505(a)(1) of the Act authorizes citizen enforcement actions by any "person" against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

21.  The Commonwealth is a "person" having an interest which is or may be adversely affected by violations of NPDES permit requirements and for unpermitted discharges of pollutants. *See* 33 U.S.C. § 1365(g).

22.  Under section 505 of the Act, this Court has authority to enjoin Ondrick's violations of the Act's prohibition on unauthorized discharges of pollutants and to require the company to comply with the Stormwater Permit. The Court also has authority to impose penalties of up to $64,618 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a) and 1319(d); 40 C.F.R. § 19.4; 88 Fed. Reg. 989 (Jan. 6, 2023).

## STATEMENT OF FACTS

### *Description of Facility and Activities*

23.    The Facility is located on almost 28 acres abutting the north bank of the Chicopee River in the Town of Chicopee. The Facility's western boundary borders and encroaches into the Chicopee River Wetlands.

24.    Ondrick produces hot mix asphalt and aggregate at the Facility.

25.    The Facility is also used for the disposal and recycling of construction and demolition debris.

26.    The Company conducts activities with the industries described in paragraphs 24 and 25 outdoors, stockpiles industrial materials uncovered outside in large piles, and drops industrial materials on the ground. Industrial materials used or processed by Ondrick mix with other sediments on the ground.

27.    Pollutants from the Facility are tracked onto Fuller Road by trucks and other vehicles departing the Facility.

### *Ondrick's Discharges of Polluted Stormwater into Waterways*

28.    During every rain or snowmelt event, stormwater runoff flows over industrial materials, sediment, containers, vehicles, equipment, and the ground surface at the Facility.

29.    Defendant discharges polluted stormwater from the Facility into the Chicopee River Wetlands to the west of the Facility from three separate discharge locations. The Chicopee River Wetlands have a continuous surface connection to the Chicopee River.

30.    Defendant discharges polluted stormwater from the Facility into the Chicopee River to the south from two separate discharge locations.

7

31. Stormwater polluted by sediment tracked out of the Facility and onto Fuller Road is discharged to a catch basin that is part of the Chicopee municipal storm sewer system.

32. Stormwater discharged into the catch basin on Fuller Road flows to the Chicopee River.

33. Ondrick submitted an NOI to EPA that identified only one stormwater discharge location (also known as "outfall") at the Facility, located at GPS numbers (+42.09453; -72.33278).

34. The following aerial image, taken from Google Earth and annotated by the Attorney General's Office, shows the location of the Facility, the direction of stormwater flow off the Facility, the outfall identified by Ondrick in its NOI, and the five other locations at which pollution from the Facility is discharged into the Chicopee River Wetlands, the Chicopee River, and the Chicopee municipal separate storm sewer system.



8

*Ondrick's Violations of the Stormwater Permit at the Facility*

35.     Ondrick has not identified the locations of its stormwater discharges to the Chicopee River Wetlands, and the Company does not monitor or control pollution that discharges from these locations.

36.     Ondrick has not identified the location of its second stormwater discharge to the Chicopee River, and the Company does not monitor or control pollution that discharges from this location.

37.     Ondrick has not identified the location where stormwater containing pollution from its Facility flows to a catch basin on Fuller Road, and the Company does not monitor or control pollution that discharges from this location.

38.     Ondrick has violated the Stormwater Permit for at least the last five years by failing to:

      a.     prepare a SWPPP for the Facility that includes a description of all six of its stormwater outfalls and (violation of Stormwater Permit, section 6.2.2);

      b.     submit to EPA an NOI that identifies all six of its stormwater outfalls (violation of Stormwater Permit, section 1.3.2);

      c.     select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges as required for its primary industrial activity (violation of Stormwater Permit and sections 2.1);

      d.     collect and analyze stormwater samples and document monitoring procedures for monitoring requirements at all six of its stormwater outfalls as required for its primary industrial activity (violation of Stormwater Permit, section 4), including:

9

   i. benchmark monitoring for:

     1. total suspended solids ("TSS") (Stormwater Permit, section 8.D.4 (asphalt paving and roofing facilities);

   ii. indicator monitoring for PAHs (Stormwater Permit, section 8.D.3 (asphalt paving and roofing materials));

  e. report all monitoring data to EPA within mandatory deadlines (violation of Stormwater Permit, section 7);

  f. conduct routine facility inspections and quarterly visual assessments that include all six of its stormwater outfalls and the Company's primary (violation of Stormwater Permit, sections 3.1 and 3.2);

  g. conduct and document corrective action and additional implementation measures within mandatory timelines to expeditiously eliminate excessive stormwater pollution whenever required by the permit (Stormwater Permit, section 5); and

  h. timely prepare and submit to EPA annual reports that include findings from the facility inspections and visual assessments and the documentation of corrective actions (Stormwater Permit, section 7.4).

*Potential Impacts from Pollutants in Stormwater Discharges from the Facility*

39. The Facility's stormwater discharges likely contain a myriad of pollutants associated with its industrial activities. These pollutants are likely to include, among other things, heavy metals and PAHs. Many of the pollutants discharged in the Facility's stormwater may be measured directly or by the presence of TSS.

40.     TSS is an indicator parameter that measures the presence of solids, or sediment, suspended in a water sample. Solids in scrap recycling stormwater discharges are likely to include non-dissolved metal particles and contaminated soil. Even uncontaminated sediment destroys habitat, harms aquatic organisms, and can contribute to flooding. Sediment settles to the bottom of a river where it disrupts and smothers bottom feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe. Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food, and reducing fish populations. In addition, other pollutants, including toxic pollutants such as heavy metals, pesticides, and petroleum by-products, bind to sediment and can significantly impact water quality when carried by stormwater to rivers and other waterbodies.

41.     PAHs are a class of chemicals that occur naturally in coal, crude oil, and gasoline. They also are produced when coal, oil, gas, wood, and garbage are burned. Research indicates that PAH exposure can cause the following effects on aquatic life: early mortality, edema, hemorrhaging, disruption of cardiac function and deformities. Additionally, PAH toxicity can affect the reproduction, behavior, and growth of fish. PAHs are considered environmental contaminants that pose significant risk to health of fish.

*Water Resources and Communities at Risk*

42.     The Chicopee River is a popular destination for swimming, fishing, hiking, and boating. It is also a major tributary to the Connecticut River.

11

43. The residents residing in the area to the south of the Facility across the Chicopee River have the potential to be disproportionately impacted by environmental harms and risks.

44. The confluence of the Chicopee and Connecticut Rivers, downstream from the Facility, has been designated as estimated and priority habitat for several state-listed "endangered" and "Special Concern" species. Endangered and Special Concern species in the area include the Shortnose Sturgeon, the Riverine Clubtail (dragonfly), the Yellow Lampmussel (mussel), and the Tidewater Mucket (mussel).

## CAUSE OF ACTION

**Noncompliance with the Federal Stormwater Permit:**
**Violations of section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

45. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

46. Ondrick is a "person" within the meaning of section 502(5) of the Act, 33 U.S.C. § 1362(5).

47. The Chicopee River is a "navigable waters" within the meaning of section 502(7) of the Act, 33 U.S.C. § 1362(7).

48. The Chicopee River Wetlands are considered "navigable waters" within the meaning of section 502(7) of the Act, 33 U.S.C. § 1362(7).

49. Ondrick has violated and continues to violate the Stormwater Permit at the Facility by failing to implement its requirements, as set forth in paragraphs 23 and 44, above.

50. Each of Ondrick's violations of each of the requirements of the Stormwater Permit is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

51.    These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the following relief:

1.  Require Ondrick to comply with EPA's federal Stormwater Permit;

2.  Order Ondrick to pay civil penalties of up to $64,618 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a) and 1319(d); 40 C.F.R. §§ 19.4; 88 Fed. Reg. 989 (Jan. 6, 2023);

3.  Order Ondrick to take appropriate actions to restore the quality of protected areas impaired by its activities;

4.  Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5.  Award any such other and further relief as this Court may deem appropriate.

Dated: February 25, 2025                  Respectfully submitted,


                                          COMMONWEALTH OF MASSACHUSETTS

                                          By its attorneys,
                                          ANDREA JOY CAMPBELL
                                          ATTORNEY GENERAL

                                          John S. Craig (Bar No. 707067)
                                          Assistant Attorney General
                                          Environmental Protection Division
                                          Office of the Attorney General
                                          One Ashburton Place, 18th Floor
                                          Boston, Massachusetts 02108
                                          Tel: (617) 727-2200
                                          John.craig@mass.gov

14